THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

EDWARD LAMONT WOMBLE,         )
                              )
            Petitioner,       )
                              )
       v.                     )   1:21CV232
                              )
NORTH CAROLINA,               )
                              )
            Respondent.       )

RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Petitioner Edward Lamont Womble, a prisoner of the State of North Carolina, filed a Petition [Doc. #3] seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court struck that Petition as being deficient, but allowed Petitioner to file a Corrected Petition [Doc. #9]. The Corrected Petition challenges Petitioner's conviction on July 6, 2018, in the Superior Court of Moore County, North Carolina, for first-degree rape, first-degree sexual offense, crime against nature, assault with a deadly weapon, assault by pointing a gun, assault on a female, willfully communicating threats, and possession of a firearm by a felon. State v. Womble, 272 N.C. App. 392, 846 S.E.2d 548 (2020). Petitioner received sentences of 386 to 524 months for the first-degree rape and first-degree sexual offense convictions, a sentence of 25 to 39 months for possession of a firearm by a felon, and a consolidated sentence of 10 to 21 months for the remaining charges. (Respondent's Brief [Doc. #18], Ex. A.) Petitioner filed a direct appeal, but the North Carolina Court of Appeals affirmed his conviction and Petitioner did not seek discretionary review from the North Carolina Supreme Court.

Petitioner thereafter filed a Motion for Appropriate Relief in the trial court. (Respondent's Brief, Ex. G.) After that Court denied the Motion, Petitioner unsuccessfully sought writs of certiorari from both the North Carolina Court of Appeals and the North Carolina Supreme Court. (Respondent's Brief, Exs. J, L.) Petitioner then filed the current action in this Court. Respondent opposes the Petition with a Motion to Dismiss [Doc. #17], Petitioner filed a Response [Doc. #20], and Respondent's Motion to Dismiss is now before the Court.

Facts and History

The extensive facts of the case, as set out on direct review by the North Carolina Court of Appeals are as follows:

> The State's evidence at trial tended to show the following: defendant and Crystal were married on 25 August 2011. Together, they have one child, and Crystal had five other minor children. Defendant grew abusive toward Crystal during their marriage, and they separated in March 2013. After Crystal filed for divorce in March 2015 and before the divorce was finalized in January 2016, she and defendant began communicating about their son and saw each other regularly.
>
> In November 2015, Crystal and her minor children lived in her mother's house outside of Carthage in Moore County. Defendant stayed at least part-time in the home of his girlfriend, Shantell Kimes, in Ramseur.
>
> Ms. Kimes purchased two Cobra .380 caliber, semi-automatic pistols for defendant in 2015. The first gun, which Ms. Kimes purchased on 30 June 2015, was seized by law enforcement on 5 November 2015. The second gun was purchased by Ms. Kimes on 16 November 2015 and seized on 24 November 2015. At the time of defendant's trial, Ms. Kimes had pled guilty to federal gun charges stemming from these two straw purchases and was awaiting sentencing. She had hoped to obtain a lesser sentence as a result of her testimony against defendant.
>
> A. The 5 November 2015 Incident
>
> On 5 November 2015, defendant and Crystal had an argument about their relationship while parked in her car in a church parking lot near her mother's house. When Crystal told defendant she would not reconcile with him, he slapped her and said, "You need to get away from me before I kill you." Crystal

exited the car. Defendant took her place in the driver's seat and said, "You think I'm playing with you? ... I'll shoot you and your kids[,]" before driving off in her car.

Crystal called 911 and reported that her "husband was going to get a gun to come back and shoot [her] and [her] kids." While still on the phone, Crystal heard her car returning and hid behind a shed. Defendant drove past Crystal to her mother's house. Defendant asked Crystal's mother where Crystal was before proceeding onto McCrimmon Road toward State Highway 15-501. Crystal remained on the phone with 911 until law enforcement arrived at her location.

Responding to the 911 call, Detective Rodriguez and Captain Medlin of the Moore County Sheriff's Office stopped defendant's vehicle at the intersection of McCrimmon Road and Highway 15-501. Corporal Cameron also responded to the scene and observed Detective Rodriguez speaking to defendant beside a white Honda Civic. Defendant "stated that it wasn't his car and he stated it was registered to his wife, Crystal ...." After obtaining Crystal's consent to search the car, officers found "what appeared to be a half[-]burnt marijuana cigarette ... in the small pocket of the [front] door." Corporal Cameron also found defendant's driver's license and "several small handgun caliber bullets ... in the glove box," and a black Cobra .380 caliber, semi-automatic handgun under the passenger seat. Defendant was charged with multiple offenses related to the items seized during the traffic stop but was not taken into custody.

Captain Medlin drove to Barbers Park Drive to check on Crystal, who said "she had gotten into an argument with [defendant] over custody of a child and that the argument had escalated ... to the point where he said he was going to leave to go get a gun and come back and shoot her and the kids." Captain Medlin advised Crystal to go to the magistrate's office to "swear out a warrant [against defendant] for communicating threats[.]" Crystal did so that same day and received an ex parte protection order from the trial court.

B. The 24 November 2015 Incident

Defendant spent the night of 23 November 2015 at Ms. Kimes's home in Ramseur and set an alarm clock for 4:30 a.m. Ms. Kimes asked why he was setting the alarm, and he replied, "So I can kill Crystal." When the alarm clock sounded on the morning of 24 November 2015, defendant got up, took a shower, and again told Ms. Kimes, "I'm going to kill Crystal." Defendant retrieved his Cobra .380 caliber, a semi-automatic pistol, from Ms. Kimes's closet, and left in Ms. Kimes's white Nissan Altima.
Crystal drove her son to the bus stop at 5:30 a.m. on 24 November 2015. When the bus arrived, her son exited her car and boarded the bus. While Crystal was adjusting her car's heater and "not paying attention," defendant opened the car

3

door, sat down in the passenger seat with a gun in his hand, and said, "You wasn't expecting this, was [sic] you?" Defendant told Crystal to drive to the home of James A. Gilmore, who lived on a dirt road near her mother's house. When they arrived in Mr. Gilmore's yard, defendant ordered Crystal out of her car and into the Altima. Crystal refused, and defendant struck her with his gun—hitting her on the top of her head and her right eyebrow. Crystal fell to the ground and dropped her phone in Mr. Gilmore's yard before getting into the Altima, her head "pouring" blood.

On the morning of 24 November 2015, Mr. Gilmore saw Crystal's car and cell phone in his yard, and found the circumstance to be "kind of strange" because Crystal had never parked her car at his house. He picked up the phone and walked to Crystal's mother's house. When Mr. Gilmore handed the phone to Crystal's mother and told her Crystal's car was in his yard, she asked Crystal's daughter to call 911. Lieutenant Williams and other members of the Moore County Sheriff's Office responded to the call and began an investigation into Crystal's disappearance.

Defendant drove Crystal to a boat landing on a dirt road near Carbonton, saying he was "going to kill [her], put [her] body in a ditch so [her children] can't find [her]." Defendant parked at the boat landing and asked Crystal for sex. Because defendant was holding her at gunpoint, Crystal engaged in oral and vaginal intercourse with him. After having sex with Crystal, he began to ask her, "Why did I do this? What am I going to do now? ... I can't take you back."

Defendant returned with Crystal to Ms. Kimes's house and parked in the driveway. He tried to stab Crystal with a syringe full of insulin, which he used to treat his diabetes. When the needle broke off of the syringe, defendant drove away from Ms. Kimes's house and parked on a side street where he continued to fight with Crystal, biting her on the right hand.

After speaking to Crystal's mother, Lieutenant Williams called Detective Rodriguez, told him Crystal was missing, and asked him to go to defendant's mother's house and try to locate defendant. Detective Rodriguez went to defendant's mother's residence and asked her to "please contact [defendant] to see if he knew where Crystal was." Defendant's mother spoke to defendant on his cell phone and then gave Detective Rodriguez his phone number. Detective Rodriguez immediately called defendant and asked if he had seen Crystal. Defendant said he had not seen Crystal and did not know where she was. Approximately fifteen minutes later, Crystal phoned Detective Rodriguez and said she was fine and was visiting friends in Asheboro. Detective Rodriguez asked Crystal to call Lieutenant Williams and verify she was okay.

4

Defendant next drove with Crystal to mechanic Joe Brady's garage in Siler City, where he asked Mr. Brady if he could take a "look at the Mazda out back" behind the garage. Defendant instead took a cup containing the broken syringe and the bloody tissues Crystal had used on her head wounds and deposited the cup in a "burn barrel" Mr. Brady kept on the property to burn trash. Mr. Brady remained in the garage but saw defendant "walk[ ] out back" in the direction of the Mazda.

As Crystal pleaded with defendant to take her home, he instead drove to the home of another friend in Siler City, Richard McSwain, who noticed a mark on Crystal's forehead. Defendant asked Mr. McSwain to "hold" defendant's gun, but he refused.

While at Mr. McSwain's house, Crystal borrowed a phone to call Lieutenant Williams. With defendant listening in on the call, Crystal told Lieutenant Williams she was visiting friends in Asheboro. Lieutenant Williams asked Crystal to go to the Asheboro Police Department to confirm she was safe. After the call, Crystal's family told Lieutenant Williams that Crystal "doesn't know anybody in Asheboro."

Lieutenant Williams contacted Detective Rodriguez and instructed him to return to defendant's mother's residence and serve defendant with the outstanding arrest warrant from the 5 November 2015 incident. Detective Rodriguez called defendant, said he needed to take a statement from him, and asked to meet him at his mother's house. Defendant agreed and said he was approximately 45 minutes from his mother's house.

Defendant drove back to Ramseur and stopped at a BP gas station on State Highway 64. Defendant left Crystal at the BP station, saying he had to attend court in Carthage and would come back for her. Crystal entered the store and went into the restroom to tend to her still-bleeding head. When she emerged from the restroom, she asked the store's cashier if she could use the phone.

Diane Helms was working at the BP station when Crystal came inside with a wound on her forehead and asked to use the restroom. When Crystal emerged from the restroom, "[s]he was just kind of walking around, looking out the window" toward the gas pumps. Ms. Helms asked her what had happened. Crystal appeared "nervous and upset" and did not answer. A few minutes later, Crystal asked to use the phone and told Ms. Helms, "He has a gun."

After leaving Crystal at the BP station, defendant drove back to Ms. Kimes's residence and placed his .380 caliber handgun back in her bedroom closet. He then told Ms. Kimes, "Let's go, [be]cause the police is at my mama['s] house."

5

As Ms. Kimes drove defendant back to the BP station to get gas, she noticed "a lot of blood in" her car.

Meanwhile, Crystal tried to call Detective Rodriguez, but he did not answer. She tried to call 911 to reach the Carthage police but hung up the phone when defendant arrived back at the BP station, accompanied by Ms. Kimes. Defendant put gas in Ms. Kimes's car and walked into the store to pay and check on Crystal, who promised to wait for him to come back for her. After defendant left the store and drove off with Ms. Kimes, Crystal called Lieutenant Williams and revealed what had happened to her. Lieutenant Williams told Crystal to wait for her in the store.

Defendant and Ms. Kimes drove from the BP station to his mother's house in Carthage, where they were met by sheriff's deputies. Detective Rodriguez arrested defendant on the outstanding warrant for the domestic violence protection order, and Deputy Godfrey transported defendant to the sheriff's office. Ms. Kimes also drove to the sheriff's office, where she was interviewed and consented to a search of her car and her bedroom closet where defendant had placed the handgun.

Captain Hart and Detective Fogle transported Ms. Kimes from the sheriff's office to her residence in Ramseur to retrieve the weapon. After obtaining the loaded .380 caliber pistol from a "white plastic container on top of the master bedroom closet," they drove Ms. Kimes back to the sheriff's office. Lieutenant Holders conducted a recorded interview with Ms. Kimes, which was published to the jury.

Defendant waived his Miranda rights and was interviewed by Detective Rodriguez at the sheriff's office. Defendant initially claimed he had spent the day at Ms. Kimes's residence. Confronted with the information Lieutenant Holders obtained from Ms. Kimes, however, defendant "started crying" and said, "I'm done. I'm done." Defendant "admitted to lying to [Detective Rodriguez] and that ... he had been with Ms. Crystal Womble." A copy of the audio-video recording of defendant's interview was admitted into evidence and published to the jury.

Investigator Lowery drove with Lieutenant Williams to meet Crystal at the BP station in Ramseur. He observed a laceration on Crystal's face and saw that she was upset and crying. On the way to the hospital, Crystal told the deputies about her abduction by defendant and led them to the series of locations he had taken her, including Mr. Brady's garage and the boat landing. Lieutenant Williams retrieved the cup containing the syringe and bloody tissues from the burn barrel on Mr. Brady's property. After visiting the boat landing, the deputies drove Crystal to FirstHealth Moore Regional Hospital.

6

> While awaiting medical attention, Crystal gave a partial statement about the day's events to Investigator Lowery. Hospital personnel used five stitches to close the wound on Crystal's forehead; they also x-rayed her right hand and administered a sexual assault kit evidence collection. After being released from the hospital, Crystal was taken to the sheriff's office to record a full statement before returning home.
>
> At the close of the State's evidence, defendant offered no evidence in response to the State's case. Defendant also stipulated to being a convicted felon.

Womble, 272 N.C. App. at 393-98, 846 S.E.2d at 550-53.

Petitioner's Claims

Petitioner raises ten claims for relief in his Petition. He alleges first that the State violated his right to discovery and a speedy trial and that the trial court failed to sanction the State for the violations. (Corrected Petition, § 12, Ground One.) Second, Petitioner contends that the trial court erred by not granting a motion to compel concerning other persons Crystal may have had sex with in the 72 hours prior to the assault by Petitioner. (Id. Ground Two.) Third, Petitioner contends that the trial court erred by granting the State's motion to join all of his charges from the two separate incidents with Crystal into a single trial. (Id. Ground Three.) His fourth claim alleges that the trial court erred in trying the case because it lacked jurisdiction to do so because the alleged crimes did not occur in Moore County. (Id. Ground Four.) Next, Petitioner alleges that the trial court erred in not allowing the defense to question Crystal about other persons she have had sex with in the 72 hours prior to the assault. (Id. Ground Five.) Ground six in the Corrected Petition only states "the gun" and is not otherwise explained (id. Ground Six), although in the original Petition, the claim stated that error occurred when the State presented a gun to Crystal while she was on the witness stand without first proving that it was the firearm used in the crimes (Petition, § 12, Ground 6). The seventh

7

ground for relief contends that the trial court should have suppressed the results of a rape kit gathered from Crystal by a nurse because the nurse was not specially trained to perform a sexual assault exam. (Corrected Petition, Ground Seven.) Petitioner's eighth claim asserts that he received ineffective assistance of counsel because his attorney allowed him to testify concerning jurisdiction in the case, should have called certain witnesses, and should have filed a pretrial appeal. (Id. Ground Eight.) At various points in the Corrected Petition, Plaintiff also alleges that counsel improperly failed to pursue the other claims for relief at the trial level. Petitioner's ninth claim argues that he also received ineffective assistance of counsel on appeal because his attorney did not raise the claims listed in the Corrected Petition. (Id. Ground Nine.) This is asserted at other points as well. Finally, the tenth claim for relief claims that the indictments against Petitioner for crimes against nature and possession of a firearm were defective. (Id. Ground Ten.)

## Discussion

Respondent argues in its brief that all of Petitioner's claims are procedurally defaulted because Petitioner did not exhaust them in the state courts and, if he now returned to the state courts to exhaust them, they would be subject to a mandatory procedural bar under N.C. Gen. Stat. § 15A-1419(a)(1) and (b).

This Court cannot grant relief unless a petitioner "has exhausted the remedies available in the courts of the State" as to any claims he seeks to bring in federal court. 28 U.S.C. § 2254(b). Pursuant to this statutory requirement, "a federal habeas petitioner [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim. It is not enough that all the facts necessary to support the

federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6 (1982) (internal citations omitted). The claim must be "fairly presented" to the state court, which means that it must "'be presented face-up and squarely . . . . Oblique references which hint that a theory may be lurking in the woodwork will not suffice.'" Baker v. Corcoran, 220 F.3d 276, 289 (4th Cir. 2000) (quoting Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir.1997)); see also Longworth v. Ozmint, 377 F.3d 437, 448 (4th Cir. 2004) (finding that petitioner must place "both the operative facts and the controlling legal principles" before the state courts); Hiivala v. Wood, 195 F.3d 1098, 1106-07 (9th Cir. 1999) (recognizing that "general appeals to broad constitutional principles[] such as due process" and the "mere similarity between a claim of state and federal error" does not suffice); Adelson v. DiPaola, 131 F.3d 259, 262-64 (1st Cir. 1997) (concluding that "mere incantation of constitutional buzzwords, unaccompanied by any federal constitutional analysis, does not suffice to carry the burden of demonstrating fair presentment of a federal claim").

On direct review, Petitioner raised two claims for relief, one of which faulted the trial court for allowing witnesses for the state to refer to Crystal as "the victim" and one of which faulted the trial court for doing so itself. (Respondent's Brief, Ex. D.) Neither of these claims relates in any way to the claims raised in the current Petition. In Petitioner's Motion for Appropriate Relief, he raised a claim that charging him with first-degree kidnapping based on an intent to commit first-degree rape and a first-degree sexual offense while also prosecuting him for first-degree rape and a first-degree sexual offense constituted double jeopardy. (Id., Ex. G.) He also claimed that trial and appellate counsel provided ineffective assistance of counsel by failing to raise a double jeopardy challenge on this basis. (Id.) He did not raise

9

any of his present claims in his Motion for Appropriate Relief and, conversely, does not raise the claims from the Motion for Appropriate Relief in the present case. Although Petitioner does raise claims of ineffective assistance in his Petition, they relate to the substantive issues raised in the Corrected Petition, not the double jeopardy claim raised in the Motion for Appropriate Relief. As a result, Petitioner utterly failed raise or exhaust any of his current claims in the state courts.

Further, Petitioner's unexhausted claims are procedurally defaulted because, where a petitioner fails to exhaust a claim but would find his unexhausted claim subject to a mandatory state procedural bar if he returned to state court for exhaustion, a federal procedural default also occurs. Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998) ("A procedural default also occurs when a habeas petitioner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" (quoting Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)); see also O'Sullivan v. Boerckel, 526 U.S. 838, 847 (1999). As set out above, Petitioner failed to raise his claims either on direct appeal or in his Motion for Appropriate Relief. If he returned to the state courts to exhaust them, they would be subject to a mandatory procedural bar under N.C. Gen. Stat. § 15A-1419(a)(1) and (b). These bars are well-established, independent and adequate state bars to relief. Bacon v. Lee, 225 F.3d 470, 476 (4th Cir. 2000) ("We have consistently held that [N.C. Gen. Stat. § 15A-1415(a)(1)] constitutes an independent and adequate state ground that may give rise to procedural default of federal habeas claims."); Phillips v. Lewis, 683 F. App'x 207, 209 (4th Cir. 2017). Therefore, the claims are procedurally defaulted in this Court.

To overcome that procedural default, Petitioner must demonstrate either (1) cause for the default and actual prejudice from a violation of federal law, or (2) that this Court's refusal to address his claim will result in a miscarriage of justice. See Longworth, 377 F.3d at 447-48. If not, then the Court cannot consider the defaulted claims. Here, Petitioner in his Response [Doc. #20] makes no showing of cause, prejudice, or a miscarriage of justice, and instead simply argues the merits of his claims.

The Court does note that in the Petition itself, Petitioner contends that he did not raise his claims on direct appeal due to ineffective assistance of appellate counsel, and he repeats this assertion as a separate claim in Claim 9. In some circumstances, ineffective assistance of appellate counsel may serve as "cause" to excuse a procedural default. However, "the exhaustion doctrine . . . generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." Murray v. Carrier, 477 U.S. 478, 488–89 (1986); see also Edwards v. Carpenter, 529 U.S. 446, 453 (2000). Here, Petitioner did not raise this independent claim of ineffective assistance of appellate counsel in the state courts, and has not attempted to show cause for his failure to do so.[1] Therefore, Petitioner cannot use this contention to excuse his procedural default of the claims in his Petition.

---

[1] The Court also notes that even if this claim had been exhausted, Petitioner has not made the requisite showing to establish a basis for a claim of ineffective assistance of appellate counsel. To the extent that Petitioner contends that he received ineffective assistance of appellate counsel because his appellate counsel did not raise more than one claim, and did not raise any of the claims that Petitioner now raises in his Petition, Petitioner has not shown that this in any way fell below a reasonable standard for appellate counsel. Moreover, any attempt to raise this claim in state court would now be procedurally barred by N.C. Gen. Stat. § 15A-1419(a)(3), since Petitioner failed to include it in his state MAR, so the claim of ineffective assistance of appellate counsel is itself procedurally defaulted.

Moreover, with respect to the procedural default of his claims, Petitioner has not shown actual prejudice from a violation of federal law or a miscarriage of justice if his claims are not considered, and indeed he mainly raises only state law issues that would not be cognizable in a federal habeas proceeding. Therefore, for all of the reasons set out, Respondent's Motion to Dismiss based on procedural default should be granted.

Finally, the Court notes that in some circumstances, procedural default can be excused for claims of ineffective assistance of trial counsel (but not appellate counsel) if the claim is substantial and could not be raised on direct appeal. See Martinez v. Ryan, 566 U.S. 1 (2012); Davila v. Davis, 137 S. Ct. 2058 (2017). However, even if Martinez applied here, Petitioner has not demonstrated that his claims of ineffective assistance of trial counsel are substantial. In order to prove ineffective assistance of counsel, a petitioner must establish, first, that his attorney's performance fell below a reasonable standard for defense attorneys and, second, that he was prejudiced by this performance. See Strickland v. Washington, 466 U.S. 668 (1984). As to the first prong of Strickland, Petitioner bears the burden of affirmatively showing deficient performance. See Spencer v. Murray, 18 F.3d 229, 233 (4th Cir. 1994). As to the second prong, to establish prejudice, Petitioner must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694. Here, in Claim 8, Petitioner contends that he received ineffective assistance of trial counsel because his trial counsel should not have allowed him to testify regarding the locations of various events. However, Petitioner's testimony was not before the jury, and was instead just for a hearing before the judge regarding the issue of jurisdiction or venue. Petitioner has not shown how allowing or recommending

12

this testimony was deficient performance or in any way prejudicial. Petitioner also raises vague, conclusory assertions contending that trial counsel should have called other witnesses, should have filed a pretrial appeal, or should have pursued other claims for relief. None of these contentions reflect any deficient performance by trial counsel or prejudice to Petitioner, nor are they substantial claims of ineffective assistance of counsel to be considered despite any procedural default. Therefore, even if considered under Martinez, Petitioner has not shown a sufficient basis to overcome the procedural default here.

IT IS THEREFORE RECOMMENDED that Respondent's Motion to Dismiss [Doc. #17] be granted, that the Corrected Petition [Doc. #9] be dismissed, that this action be dismissed, and that, there being no substantial issue for appeal concerning the denial of a constitutional right affecting the conviction nor a debatable procedural ruling, a certificate of appealability not issue.

This, the 13th day of February, 2023

/s/ Joi Elizabeth Peake
United States Magistrate Judge